UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JA'LIN WILLIAMS,
    Plaintiff,

v.     CAUSE NO.: 2:15-CV-283-JEM

NORFOLK SOUTHERN CORPORATION
and NORFOLK SOUTHERN RAILWAY
COMPANY,
    Defendants.

**OPINION AND ORDER**

This matter is before the Court on Norfolk Southern's Motion for Summary Judgment [DE 31], filed by Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company (collectively, "Norfolk") on October 31, 2017.

**I.    Procedural Background**

On July 27, 2015, the Complaint of Plaintiff Ja'Lin Williams, originally filed in state court on June 19, 2015, was removed to this Court. The Complaint asserts claims against Defendants for serious injuries sustained by Williams when he was struck by a freight train operated by Norfolk. Norfolk filed the instant Motion for Summary Judgment on October 31, 2017, Williams filed a response on December 28, 2017, and Norfolk filed a reply on January 10, 2018.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

**II.    Summary Judgment Standard**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate – in fact, is mandated – where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted). To demonstrate a genuine issue of fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Liberty Lobby*, 477 U.S. at 249-50.

### III. Undisputed Material Facts

Northern District of Indiana Local Rule 56-1 requires the moving party to include with its motion for summary judgment a "'Statement of Material Facts' that identifies the facts that the moving party contends are not genuinely disputed." N.D. Ind. L.R. 56-1(a). In response, the

opposing party is obligated to file a "'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed." N.D. Ind. L.R. 56-1(b)(2). In this case, as the moving party, Norfolk has submitted a Statement of Material Facts. Williams in response has incorporated in his brief a "Statement of Genuine Disputes/Material Facts Requiring the Denial of Summary Judgment." That statement lists Williams' version of the facts with appropriate citations to evidence but does not clearly identify which of Norfolk's facts, if any, he disagrees with. In the interest of justice, the Court has attempted to ascertain areas of dispute, but reminds counsel of the importance of complying with applicable rules. *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (noting that the Seventh Circuit has routinely sustained "the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts").

Shortly after 1:00 a.m. on June 23, 2013, Williams was struck by a freight train operated by Norfolk at the 117th Street railway crossing in Whiting, Indiana, sustaining serious injuries. The night of the incident, Williams and a group of friends visited Whihala Beach and Whiting Lakefront Park, just northeast of the railway crossing at issue in this case. They parked their car on the southwest side of the crossing and traversed the crossing on foot to visit the park. After a police officer later told them the park was closed and ordered them to leave or risk arrest, the group lingered at the park for a few more minutes until they saw the squad car returning. At that point they ran away, exiting the park. Williams and some of his friends attempted to traverse the railway crossing on foot in order to return to the car they had arrived in.

The railway crossing at which the incident occurred consists of five pairs of rails traversing 117th Street. The tracks run in a southeast-to-northwest direction, making the pair of rails closest

to the Whihala beach entrance, operated by CN Railway, roughly perpendicular to the stretch of 117th Street that it intersects with. There are flashing signals and automatic gates flanking the CN Railway track on the northeast and southwest, serving as warning devices for travelers on 117th Street. The street then turns somewhat to the right, traveling westbound, and crosses four more sets of tracks at an oblique angle. Those four tracks, the first two of which are operated by CSX Transportation, Inc. and the final two of which operated by Norfolk, share a set of warning devices, consisting of one flashing signal and gate to the northeast of the CSX tracks and second flashing signal and gate southwest of the Norfolk Southern tracks. There are no additional signals or gates between the CSX and Norfolk tracks. The train that struck Williams was on the last of those four tracks. One friend running ahead of Williams made it across all of the tracks in time to avoid the train, and another stopped just short of the track on which the train was traveling; only Williams was struck by the train.

The crew of the train at the time of the incident included an engineer and a conductor, Paul Wansitler. Wansitler saw Williams and his friends running toward the track and alerted the engineer to the presence of the pedestrians approximately thirteen seconds before the collision, but the crew did not institute emergency braking measures until at or around the point of impact. Expert testimony established that, given the speed and weight of the train, the speed at which Williams was running, and the functioning of the emergency braking mechanism, the train would have still struck Williams if the brake had been pulled at any point in the nine seconds prior to the point of impact. However, had the brake been pulled more than nine seconds prior to the point of impact, the train would have slowed sufficiently for Williams to safely clear the tracks, avoiding the collision and subsequent damages.

4

## IV. Analysis

Norfolk makes three arguments in support of its motion for summary judgment. First, it asserts that several of Williams' claims are preempted by Federal laws governing safety at railway-highway crossings. As to Williams' negligence claim, Norfolk argues that it did not breach any duty that proximately caused Williams' injuries. Finally, Norfolk argues that Williams' contributory fault for the collision accounted for more than 50% of the total fault, which would bar any recovery under Indiana law. Plaintiff argues that genuine issues of material fact exist as to whether Norfolk breached any duty that proximately caused Williams' injuries and as to whether Williams' fault for the collision exceeds 50% as a matter of law.

### A. Federal Preemption

Plaintiff's Complaint describes several conditions that he claims contributed to the incident, including insufficient warning devices at the crossing, an extra-hazardous crossing, and Norfolk's failure to appropriately sound the train horn to warn Williams and his friends of the train's approach. Norfolk argues that the Federal Railroad Safety Act and the Highway Safety Act preempt any claim based on the design of the crossing, the adequacy of warning devices, or the sounding of the horn. Indeed, "once federal funds are expended to install warning devices at a railroad crossing and those devices are installed and operating, [Federal] regulations apply and 'state tort law is preempted.'" *Janero v. Norfolk S. Ry. Co.,* No. 1:13-CV-155-TLS, 2017 WL 993055 at *4 (N.D. Ind. Mar. 15, 2017) (citing *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 670 (1993)). Among the claims preempted are claims regarding the adequacy of warning devices and "any claim that the crossing is extra-hazardous." *Id.* at *4, *7; *see also Eubanks v. Norfolk S. Ry. Co.,* 875 F. Supp. 2d 893, 900-901 (N.D. Ind. June 20, 2012). Federal regulations also govern the manner in which a train horn

must sound during its approach to a railway grade crossing. *Janero*, 2017 WL 993055 at *12 (holding that, when a train sounds its horn in a manner consistent with the federal regulation, any claim based on the inadequacy of the horn sounds is preempted).

Norfolk has argued and presented evidence to show that preemption applies in each of these areas. Williams did not respond to Norfolk's preemption arguments regarding claims based on an ultra-hazardous crossing, inadequate warning devices, and failure to appropriately sound the horn. Therefore, Williams has abandoned and waived those claims. *See, e.g., Palmer v. Marion Cnty,* 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned); *Laborers' Int'l Union of N. Am. v. Caruso,* 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented to the court in response to a summary judgment brief are deemed waived). Accordingly, summary judgment in favor of Norfolk is appropriate for any claim based on the design of the crossing, adequacy of warning devices, and manner of sound the horn.

Plaintiff's complaint also alleges that the train was traveling at excessive speed at the time of the incident. Norfolk argues that the excessive speed claim is preempted. "If a train is involved in an accident while traveling under the maximum speed prescribed by [the federal regulation], a state law claim based on excessive speed is preempted." *Anderson v. Wisc. Cent. Transp. Co.,* 327 F. Supp. 2d. 969, 975 (E.D. Wisc. July 27, 2004); *see Easterwood,* 507 U.S. at 661 (finding that federal railway speed limits preempt state law); *Janero,* 2017 WL 993055 at *9 ("[F]ederal speed limits preempt any state causes of action based on a train's allegedly excessive speed."). Norfolk argues that, because the train was operating at 40 miles per hour, a rate well under the 60 mile per hour speed limit applicable to tracks of the relevant classification, any claim based on excessive

6

speed is preempted. Williams acknowledges that the train was traveling at approximately 40 miles per hour and does not dispute Norfolk's assertion that the federal speed limit for the track on which the incident occurred was 60 miles per hour. However, Williams also argues, and Norfolk acknowledges, that an exception to federal preemption applies in the "limited circumstance of failure to slow or stop a train to avoid a specific individual hazard." Pl. Brief at 15; *see Anderson v. Wisc. Cent.*, 327 F. Supp. 2d at 975 (E.D. Wisc. July 27, 2004) (noting that some courts have held that the regulation does not preempt a claim that a train was traveling too fast to avoid a specific, individual hazard). Therefore, any claim that the train was traveling at an excessive speed is preempted, except Williams' negligence claim based on Norfolk's duty to stop or slow the train in response to the specific, individual hazard posed by the presence of Williams and his friends.

    B.    <u>Negligence Claim</u>

Norfolk contends that Williams' negligence claim must fail because Norfolk did not breach any duty which proximately caused Williams's injuries. Williams argues that Norfolk breached a duty to Williams when it failed to slow or stop the train when it was apparent that Williams and two other pedestrians were running toward the track.

To prevail on a claim for negligence, a plaintiff must establish that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused the injury to the plaintiff. *Harradon v. Schlamandinger*, 913 N.E.2d 297, 300 (Ind. Ct. App. 2009). At trial, the plaintiff bears the burden of proving that there was negligence, and "[n]egligence will not be inferred; rather, specific factual evidence, or reasonable inferences that might be drawn therefrom, *on each element* must be designated to the trial court. However, an inference is not reasonable when it rests on no more than speculation or conjecture." *Hayden v. Paragon Steakhouse*,

731 N.E.2d 456, 458 (Ind. Ct. App. 2000) (citing *Miller v. Monsanto Co.*, 626 N.E.2d 538, 541 (Ind. Ct. App.1993), *Midwest Commerce Banking Co. v. Livings*, 608 N.E.2d 1010, 1012 (Ind. Ct. App.1993)). Accordingly, "negligence cannot be inferred from the mere fact that an injury occurred." *Maroules v. Jumbo, Inc.,* 452 F.3d 639, 642 (7th Cir. 2006); *see also Western & A.R.R. v. Henderson,* 279 U.S. 639, 642-643 (1929) ("The mere fact of a collision between a railway train and a vehicle at a highway grade crossing furnishes no basis for any inference as to whether the accident was caused by negligence of the railway company, or of the traveler on the highway, or of both, or without fault of any one.").

Disposition of negligence actions in summary judgment "is rarely appropriate . . . . because negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person—one best applied by a jury after hearing all of the evidence." *Rhodes v. Wright,* 805 N.E.2d 382, 387 (Ind. 2004). However, if "undisputed material evidence negates one element of a negligence claim," summary judgment for the defendant is appropriate. *Janero,* 2017 WL 993055 at *3 (quoting *Nagel v. N. Ind. Pub. Serv. Co.,* 26 N.E.3d 30, 43 (Ind. Ct. App. 2015)).

Williams argues that genuine issues of material fact exist as to when Norfolk's duty to slow or stop the train arose, whether Norfolk breached that duty, and whether Norfolk's breach proximately caused Williams' injuries. Specifically, Williams argues that Norfolk breached its duty to slow or stop the train when Conductor Wansitler first observed Williams and his two friends running toward the tracks on which the train was traveling, and that this breach proximately caused Williams' injuries. Norfolk disagrees, contending that any duty to brake did not arise until it was too late to avoid the collision, and thus, Norfolk did not breach any duty proximately causing Williams' injuries.

8

While excessive speed claims are generally preempted, a railroad may still be subject to a duty to stop or slow a train to avoid a specific, individual hazard. *Anderson v. Wisc. Cent.,* 327 F. Supp. 2d. at 975-976. The predominant view among courts is that the duty to stop for a specific, individual hazard arises when a "transient condition . . . could lead to a particular accident." *Beal v. Nat'l R.R. Passenger Corp.,* No. 2:04 CV 250, 2006 WL 2095239 at *3 (N.D. Ind. July 27, 2006). "Generally speaking . . .a specific, individual hazard is a person, vehicle, obstruction, object or event which is not a fixed condition or feature of a crossing . . . . [A] commonly cited example is a child standing on a track or a motorist stranded on the track." *Woods v. CSX Transp., Inc.,* No. 2:07-CV-29, 2008 WL 5070352, at *6 (N.D. Ind. Nov. 24, 2008) (citations and quotations omitted); *see Herriman v. Conrail Inc.,* 883 F. Supp. 303, 307 (N.D. Ind. Apr. 24, 1995) (positing "a motorist stranded on the crossing" as an illustrative example of an individual hazard). In contrast, a condition that is "continuously present at [a particular] crossing" is not a specific, individualized hazard giving rise to a duty to slow or stop a train. *Herriman*, 883 F. Supp. at 307.

In general, the presence of pedestrians does not qualify as a specific, individual hazard. *Eubanks,* 875 F. Supp. 2d at 906; *Beal,* 2006 WL 2095239 at *3-4. Therefore, there is no duty for a train operator to apply the brakes for every pedestrian near the tracks. "Trains can't pull the emergency brake for any pedestrian, bicyclist, or automobile near the tracks; both tort law and logic dictate that the brake should be activated when–but only when–a collision is foreseeable and doing so can avoid that collision." *Eubanks,* 875 F. Supp. 2d at 906.

Plaintiff argues that the fact that Williams and his friends were running toward the tracks created the kind of specific, individual hazard that should have made it clear to the train crew that a collision was imminent. In support of this argument, Plaintiff notes that, in some cases, courts have

9

found that a motor vehicle's "unwavering approach" to railroad tracks presents a specific, individual hazard. *See Woods,* 2008 WL 5070352 at *7 (collecting cases illustrating that courts are split as to whether a car's unwavering approach to the tracks constitutes a specific, individualized hazard).

Additionally, Williams relies on dicta in the *Eubanks* decision for the proposition that the sight of pedestrians running toward train tracks triggers at duty to stop. In that case, the court held that the train operator had no duty to stop the train because, in the RailView video of the incident, the plaintiff did "not indicate (for instance, by running or by seeming to calculate the speed of the oncoming train) that she [would] dodge in front of the train" until she actually stepped in front of the train. Therefore, any "duty to apply the brake didn't arise until the last second," right before impact, by which point it was too late for the train operators to take action to avoid the collision. *Id.* Williams argues Norfolk's duty to stop was triggered when he and his friends indicated by running that they did not intend to stop for the train.

Norfolk counters that train crew members have a right to presume that adults in the vicinity of the tracks will exercise due care to avoid being hit by the train, and that a duty to brake only arises when it becomes apparent that those adults are not, in fact, exercising due care. Norfolk notes that the *Eubanks* court clarified that "the duty to brake the train comes not on first spotting any pedestrian near the track, but on realizing that a particular pedestrian won't yield to the train and braking the train will avoid the accident." Pl. Rep. at 8 (quoting *Eubanks,* 875 F. Supp. 2d at 906). Norfolk has provided evidence that the train's bell began ringing before the preceding crossing and continued to ring until after the collision, that the train's horn was sounded in accordance with Federal law as it approached the crossing, that the train gates were down and the warning lights were flashing, and that the train's headlight was on and operational. Under those circumstances, Norfolk

argues that it was entitled to presume that pedestrians approaching the track would yield the right of way to the train, and that by the time it became evident that Williams and his friends would not yield, it was too late too avoid to the collision.

To prevail on a claim of negligence, Williams will need to show both that Norfolk had a duty to slow or stop the train and that Norfolk's breach of that duty was a proximate cause of his injury. Viewing the facts in the light most favorable to Williams, to slow the train even the marginal amount necessary to allow Williams to safely clear the tracks, the crew would have had to initiate emergency braking procedures at least nine seconds before the eventual impact, while the train was approximately 525 feet away from the point of collision. At that moment, Williams and his friends were still a considerable distance away from the tracks. The RailView video of the interval nine to thirteen seconds before the impact does not make it clear whether the conductor and engineer could have reasonably concluded, from that distance, that one of the pedestrians would run into the path of the train. Braking at any point within the nine seconds prior to impact would not have slowed the train enough to prevent the incident.

Williams has also presented evidence that Conductor Wansitler did not believe he had a duty toward pedestrians moving toward the tracks, as indicated by his testimony that, between monitoring signals and bulletins and the like, he had "enough responsibilities to take care of than to look out for somebody else's well-being. If they can't heed the warning of crossing gates and a horn and a bell, then it's not my responsibility to look out for [pedestrians]." As discussed above, courts have had a more nuanced view of the duties of train operators than that expressed by Conductor Wansitler, finding that, if it becomes clear that a collision is imminent while there is still time to avoid the impact, train operators do have a duty to stop. Nevertheless, Conductor Wansitler and the train's

engineer both testified that, when they first glimpsed Williams and his friends from over 500 feet away, they believed that the pedestrians would hear the horn and bell, see the train's lights, and stop running in time to avoid a collision. And, in fact, several seconds later, one of Williams' friends did stop running just short of the track that the train was on. Under those circumstances, it is possible that no duty to stop the train arose at any point prior to nine seconds before the collision. However, even a jury were to find that Norfolk's duty to stop or slow the train arose more than nine seconds before the collision, Williams would still need to overcome Norfolk's third argument, which rests on Williams' contributory fault for his injuries.

    C.    <u>Contributory Fault</u>

Norfolk's final argument is that Williams bore more than 50% of the fault for the incident which caused his injuries, which would bar any recovery under the Indiana Comparative Fault Act. *See* Ind. Code § 34-51-2-6 ("In an action based on fault . . . the claimant is barred from recovery if the claimant's contributory fault is greater than the fault of all persons whose fault proximately contributed to the claimant's damages."). Williams argues that the apportionment of comparative fault is an issue of fact which must be decided by the jury.

Williams is correct that, in general, the degree of comparative fault is a fact sensitive question most appropriately left to the jury. *See, e.g., Sparks v. White,* 899 N.E.2d 21, 30 (Ind. Ct. App. 2008). However, Indiana courts have recognized that "at some point the apportionment of fault may become a question of law for the court." *McKinney v. Public Service Co.,* 597 N.E.2d 1001, 1008 (Ind. App. 1992). In affirming a summary judgment in favor of the railroad in *Thiele v. Norfolk & Western Railway Co.*, the Seventh Circuit Court of Appeals held that a plaintiff who failed to "exercise due care before proceeding" onto railroad tracks where an "approaching rain was both

clearly visible and audible" bore more than half of the fault for his injury. 68 F.3d 179, 184-185 (7th Cir. 1995). Notwithstanding the general rule that comparative fault is a question for the jury, the court held that, on those facts, "[n]o reasonable jury could find otherwise than that [the plaintiff] was more than 50% responsible for his accident." *Id.*

Similarly, in *Reales v. Consolidated Rail Corporation*, the Seventh Circuit concluded that "no reasonable finder of fact could have found that [the railroad's] fault was equal or greater to" that of a 15-year-old who maneuvered her bicycle around a downed crossing gate and was struck and killed by a train. 84 F.3d 993, 997 (7th Cir. 1996). The court explained that "[t]he district court correctly found, and we agree, that the undisputed facts show that [the minor] was more than 50 percent responsible for the fatal accident." *Id.* Therefore, the court affirmed the district court's summary judgment in favor of the railroad. In contrast, in a case where a motorist drove onto a railroad crossing with no flashing light, gate, or stop sign, where obstructions alongside the tracks blocked the view in the direction from which the train was traveling, and there was evidence that the train's horn may not have been audible to a person in the motorist's position, the railroad failed to "demonstrat[e] as a matter of law that [the motorist] was negligent . . . in an amount greater than [the] defendants." *Cochran v. CSX Tranp., Inc.,* 112 F. Supp. 2d 733, 742 (N.D. Ind. June 30, 2000).

Here, if a jury were to find that Norfolk's duty to slow or stop the train arose in time to prevent the accident, the jury would next need to consider whether Williams was more than 50% negligent in causing the accident. The parties appear to dispute whether Williams ran around the warning gate, or whether that gate descended only after he and his friends passed. Williams and both of his friends testified that the gate was not yet down when they passed it; for the purposes of the instant Motion, this is accepted as true. However, Williams did acknowledge that he saw the flashing

13

warning lights behind him when he glanced back to see who was with him, and both of his friends testified that they heard the train's horn. Williams Dep. 74:2-13; Toran Dep. 24:5-9; McGee Dep. 24:5-6. One of his friends recalled hearing the train itself. McGee Dep. 26:12-14. Recorded RailView evidence indicates that the flashing lights and gates were operational, the train's horn sounded in compliance with federal law, the train's headlight was on, and its bell was ringing. Furthermore, Norfolk presents evidence, which Williams apparently does not dispute, that a pedestrian approaching from the north looking in the direction the train was coming from would have a clear and unobstructed view down the track for 1,900 feet. Wolf Decl. ¶ 4. Williams was an adult with a duty to exercise due care at a railroad crossing. Instead, undisputed evidence shows that Williams ran onto the track without first taking the simple precaution of looking up to confirm the location of the approaching train, despite the audible sounding of the horn. Williams in fact acknowledged that he did not pause before any of the tracks to look to see if a train was coming because his attention was focused on getting out of Whihala Beach Park. Williams Dep. 73:3-6, 9-12. As a matter of law, Williams failed to exercise due care.

Williams claims that his duty of care was lessened by his confusion arising from the fact that the crossing contained five separate tracks. In support of that argument, he notes that one of his friends testified that he believed the horn was coming from a train traveling on the tracks already behind them. But Williams and his friends had crossed all five sets of tracks on their way into the park, and the tracks themselves were visible as Williams and his friends approached them. Williams Dep. 72:5-11. As the train approached, one of his friends ran hard to make it across the tracks before the train, and the other stopped short of the rails to avoid a collision. McGee Dep.29:13-20. Williams alone failed to exercise the minimal precaution of looking up to see the train. Therefore, even if a

fact finder were to slightly discount Williams' culpability due to the multiple-track layout of the crossing, that fact finder could not reasonably conclude anything but that Williams' fault for the collision still exceeded the fault, if any, of Norfolk. Therefore, the Indiana Comparative Fault Act would bar any recovery.

**V.     Conclusion**

Although the events of June 23, 2013, undoubtedly caused Williams significant physical and emotional trauma and resulting economic damages, Williams has failed to establish that Norfolk bore more than 50% (if any) of the fault for the collision that caused those damages. Accordingly, the Court hereby **GRANTS** Norfolk Southern's Motion for Summary Judgment [DE 31] and **ORDERS** that judgment in this matter be entered in favor of Defendant Norfolk Southern Railroad.

SO ORDERED this 20th day of June, 2018.

s/ John E. Martin
MAGISTRATE JUDGE JOHN E. MARTIN
UNITED STATES DISTRICT COURT

cc:     All counsel of record